**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**JAMES RONALD SHEPPARD,**

      **Plaintiff,**

**v.**                                       **Case No.: 1:13-cv-21792**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**


**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's motion for summary judgment and motion to remand, (ECF Nos. 15, 18), and the Commissioner's motion for judgment on the pleadings as articulated in her brief. (ECF No. 17).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for

summary judgment and motion to remand be **DENIED**, that the Commissioner's motion for judgment on the pleadings be **GRANTED**, and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.   Procedural History

Plaintiff, James Ronald Sheppard ("Claimant"), filed the instant DIB application on December 15, 2010, alleging a disability onset date of July 2, 2010.[1] (Tr. at 153). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 66, 74). Claimant filed a request for an administrative hearing, (Tr. at 77), which was held on June 7, 2012, before the Honorable Steve A. DeMonbreum, Administrative Law Judge ("ALJ"). (Tr. at 41-63). By written decision dated June 25, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 28-35). Claimant filed a request for review by the Appeals Council and submitted new evidence in support of his claim, which was incorporated into the administrative record. (Tr. at 4). The ALJ's decision became the final decision of the Commissioner on July 3, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 12, 13), both parties filed memoranda in support of judgment on the pleadings, (ECF Nos. 16, 17), Plaintiff filed an additional motion to remand, (ECF No. 18), and the Commissioner filed a response in opposition. (ECF No. 20). Consequently, the matter is fully briefed and ready for resolution.

---

[1] Claimant also applied for Social Security Income ("SSI") on December 6, 2010, (Tr. at 146), but does not appear to have pursued this claim beyond filing the initial application. The undersigned does note that in his SSI application, Claimant reported owning assets, (Tr. at 147), which exceed the statutory maximum amount permitted to be eligible for SSI. *See* 42 U.S.C. § 1382(a)(2)(B); 20 C.F.R. 416.1205(b). (Tr. at 147).

## II.    Claimant's Background

Claimant was 50 years old at the time he filed the instant application for benefits and 52 years old at the time of the ALJ's decision. (Tr. at 35, 146). He is a high school graduate and communicates in English. (Tr. at 188, 190). He has past relevant work experience working as a fleet truck mechanic. (Tr. at 40, 190). Claimant was diagnosed with Parsonage-Turner syndrome in 2003.[2] (Tr. at 258).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a

---

[2] **Parsonage Turner syndrome**, also called brachial neuritis, is characterized by the sudden onset of shoulder and upper arm pain followed by marked upper arm weakness or atrophy. Individuals may present with the condition several weeks after an injury, infection or immunization, or in the absence of an obvious inciting event. Treatment is symptomatic and may include pain relievers and physical therapy. Although affected individuals may experience paralysis of the affected areas that lasts for months or even years, prognosis is generally favorable with most individuals experiencing complete recovery within 2 years. © U.S. Department of Health and Human Services, National Institutes of Health, Office of Rare Diseases Research, 2013.

severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2014. (Tr. at 30, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant

4

had not engaged in substantial gainful activity since July 2, 2010, the alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "parsonage-turner syndrome and bilateral shoulder osteoarthritis." (*Id.*, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 30-31, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of light work as defined in 20 C.F.R. 404.1567(b). More specifically, the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently, sit for about 6 hours total in an 8-hour workday, and stand and/or walk for about 6 hours total in an 8-hour workday. Additionally, the claimant can never reach overhead with his bilateral upper extremities and no more than frequent reaching in all other directions. The claimant can occasionally crouch, but never crawl or climb ladders, ropes, or scaffolds. Finally, the claimant should avoid concentrated exposure to extreme cold temperatures, humidity, wetness, and vibrating surfaces and should avoid even moderate exposure to hazards, such as dangerous moving machinery and unprotected heights.

(Tr. at 31-34, Finding No. 5). At the fourth step of the sequential evaluation process, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 34, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 34-35, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1960, and was defined as an individual closely approaching advanced age; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 34, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could

perform jobs that exist in significant numbers in the national economy, (Tr. at 34-35, Finding No. 10). The ALJ found that at the light, unskilled level, Claimant could work as an assembler; a packer; and an inspector, tester, or sorter. (Tr. at 35). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (*Id.*, Finding No. 11).

## IV.   Claimant's Challenge to the Commissioner's Decision

Claimant argues that the ALJ (1) improperly discounted the credibility of Claimant's testimony, (ECF No. 16 at 11-15), and (2) improperly weighed the medical evidence on record, thereby rendering his RFC determination unsupported by substantial evidence. (*Id.* at 15). More specifically, Claimant complains that the ALJ erred in his selective treatment of the medical records and opinions of Dr. Smith and Dr. Rago. (*Id.* at 16-18). Additionally, Claimant seeks remand so that the Commissioner may re-evaluate Claimant's application in light of new evidence submitted to the Court that was not available to the ALJ or the Appeals Council. (ECF No. 18).

## V.   Relevant Medical History

### A. Treatment Records

#### 1. 2003-2008: Diagnostic Examinations and Treatment

On May 2, 2003, Claimant underwent a left shoulder CT scan, which revealed "degenerative changes of the AC and the shoulder joint," but no evidence of acute fracture or bone destruction or soft tissue calcifications." (Tr. at 231). On May 23, 2003, Claimant was referred to Frederick B. Morgan, D.O., at the Orthopaedic Center of the Virginias. (Tr. at 228-30). Claimant complained of bilateral shoulder pain which developed one month earlier. (Tr. at 228). Claimant reported that he had seen great improvement with shoulder injections, but that his pain was "still approximately 2/10

and increased with activities, especially overhead motions." (*Id.*). Claimant's physical examination was normal except with respect to his shoulders. (Tr. at 229). In his right shoulder, Claimant had full range of motion with minor pain in abduction, mild tenderness over the AC joint, pain with palpation over the supraspinatus tendon, and significantly decreased strength with external rotation. (*Id.*). In his left shoulder, Claimant's had mild tenderness with palpation over the AC joint, and tenderness over the supraspinatus tendon. (*Id.*). Claimant was assessed with "bilateral rotator cuff tendonitis with degenerative AC joint changes" and "possible right rotator cuff tear." (*Id.*). He was given anti-inflammatory medication, instructed to attend physical therapy for rotator cuff strengthening, and to follow up in one month if he continued to have significant pain and weakness. (Tr. at 230).

On June 20, 2003, Claimant returned to Dr. Morgan with "significant atrophy of the shoulders and noted weakness" as well as continued shoulder pain rated at "approximately 4/10 and increased with activity." (Tr. at 344). Physical examination of Claimant's right shoulder revealed full range of motion with minor pain in abduction, mild tenderness over the AC joint, mild pain with palpation over the supraspinatus tendon, significantly decreased pain with external rotation, diminished reflexes in the triceps, and his right scapula was winged. (*Id.*). In his left shoulder, Claimant had full range of motion without difficulty, but his AC joint was mildly tender to palpation, and he exhibited tenderness over the supraspinatus tendon, diminished strength with external rotation, and diminished reflexes in the triceps. (Tr. at 344-45). He was assessed with "rotator cuff tear versus neurologic impingement," "possible subscapularis cyst," and a "winged right scapula." (Tr. at 345). Dr. Morgan "felt that most of his symptoms are probable neurologic impingement" and referred him to Dr. William

Merva for further workup. (*Id.*).

On September 9, 2003, Claimant underwent a neurological consultation conducted by Lawrence H. Phillips, II, M.D. and Mark C. TeKrony, M.D., Ph.D., which was documented in a letter to referring physician William Andrew Merva, M.D. (Tr. at 380-82). Claimant's physical and neurological examinations were essentially normal, except with respect to his upper extremities. (Tr. at 381). Motor examination revealed decreased strength in Claimant's bilateral infraspinatus, right supraspinatus, right serratus anterior with winging of the right scapula, bilateral triceps, and bilateral biceps which he "tend[ed] to compensate with his brachioradialis muscles." (*Id.*). Dr. TeKrony observed that Claimant's neurological examination was "significant for atrophy of the shoulder girdle muscles bilaterally with winging of the right scapula, and weakness in the infraspinatus, supraspinatus, deltoids, and right serratus anterior" and was "consistent with the diagnosis of brachial plexopathy, or Parsonage-Turner syndrome." (*Id.*). His EMG and nerve conduction study was also consistent with chronic bilateral brachial plexopathy, the most likely cause of which was "post-viral brachial plexitis," (*Id.*). Dr. TeKrony recommended that Claimant "receive physical therapy to increase range of motion and upper extremity strength." (Tr. at 382).

The next medical record in evidence is dated more than four years later. On January 15, 2008, Claimant underwent a left shoulder x-ray which revealed "degenerative changes of the left shoulder including inferior glenohumeral region and AC joint." (Tr. at 235). The "[d]egree of degenerative changes [had] increased compared with prior exam of 4/22/03." (*Id.*). Claimant's left shoulder MRI revealed "degenerative changes of left shoulder including hypertrophic inflammatory changes of AC joint with approximation to a relatively attenuated anterior supraspinatus," "focus of increased

8

signal in distal mid portion of supraspinatus suggesting small tear," "irregularity of the tendon of long head of biceps in intertubercular sulcus compatible with tendonopathy or possible tear" or "possible subscapular tendonopathy," as well as "humeral glenoid degenerative changes with osteophytic formation noted and subchondral cyst formation involving humeral head." (Tr. at 236). There was also a "small effusion, including subcoracoid area and along tendon of long head of biceps" with "trace of fluid in subacromial and subdeltoid regions." (*Id.*).

On January 28, 2008, Claimant was treated by Dr. Morgan with complaints of left shoulder pain. (Tr. at 346). Examination of Claimant's left shoulder revealed "bony anatomy with AC joint tenderness" but was otherwise essentially normal as to observed atrophy, range of motion, rotator cuff strength, reflexes, sensation, and motor function. (*Id.*). After reviewing Claimant's recent x-ray and MRI results, Dr. Morgan assessed him with "Osteoarthritis left shoulder with impingement," and gave Claimant a left shoulder injection with instructions to follow up in 3-4 weeks. (Tr. at 347).

On February 18, 2008, Claimant was treated by Dr. Morgan with complaints of right shoulder pain. (Tr. at 343). Claimant reported experiencing "good relief from left shoulder injection." (*Id.*). In his right shoulder, Claimant exhibited "markedly positive impingement" and "tenderness over the AC joint," although he had full passive motion and his cuff strength was intact." (*Id.*). Dr. Morgan provided a right shoulder injection and instructed Claimant to follow up as needed. (*Id.*).

### 2. 2009-2012: Treatment Records from Dr. Smith

A little over a year later, on April 20, 2009, Claimant was seen by Todd Smith, D.O., at Blue Ridge Internal Medicine. (Tr. at 241-44). Claimant described symptoms of continuous pain localized to the AC joints of both shoulders, the severity of which he

rated at 7 or 8 on a scale of 10. (Tr. at 241). He also reported experiencing pain with activity, pain with range of motion, popping, stiffness with activities, stiffness with twisting, and tenderness. (*Id.*). Claimant reported that the symptoms had been worsening over the past few months. (*Id.*). Claimant's physical examination was essentially normal, except with respect to his bilateral upper extremities. (Tr. at 242-43). Claimant's biceps tendon and subdeltoid bursa revealed tenderness, he had reduced shoulder abduction, adduction, and flexion, and shoulder instability was observed. (Tr. at 243). Claimant's deltoid strength, biceps strength, and triceps strength were reduced. (*Id.*). Otherwise, Claimant had no subacromial bursa tenderness, full shoulder extension, no biceps fasciculation or atrophy, no triceps fasciculation or atrophy, and normal strength and tone in brachioradialis. (*Id.*). Claimant was assessed, in relevant part, with "osteoarthritis generalized multiple" observed as improved, "Parsonage-Turner syndrome" observed as unchanged, and "amyotrophy, neuralgic." (Tr. at 243-44). Claimant received Kenalog injections in both shoulders, as well as preventive counseling on the benefits of diet and weight control, regular sustained exercise for at least 30 minutes, 3-4 times per week, and regular health screening and checks. (Tr. at 244). Claimant was instructed to return in four months. (*Id.*).

On August 24, 2009, Claimant attended a follow-up appointment at which he requested bilateral shoulder injections. (Tr. at 245-48). Claimant's physical examination was unchanged from his prior visit. (Tr. at 247). Claimant was assessed with Parsonage-Turner syndrome, which was noted to be unchanged, and generalized osteoarthritis, multiple, noted as improved. (Tr. at 247-48). Claimant received bilateral Kenalog injections in his shoulders, as well as preventative counseling, and was instructed to follow up in three to four months. (Tr. at 248).

10

On December 14, 2009, Claimant complained of drowsiness as a side effect of Ultram. (Tr. at 249). Claimant's physical examination was unchanged from his prior visit. (Tr. at 250-51). He was assessed in relevant part with "osteoarthritis generalized multiple" which was considered to be stable. (Tr. at 251). Claimant received bilateral Kenalog injections in his shoulders, as well as preventative counseling, and was instructed to follow up in three months. (Tr. at 252).

On April 1, 2010, Claimant's physical examination was again unremarkable, except with respect to his bilateral upper extremities. (Tr. at 254-55). Claimant's biceps tendon subdeltoid bursa revealed tenderness, he had reduced shoulder abduction, adduction, and flexion, and shoulder instability was documented. (Tr. at 255). Claimant's deltoid strength, biceps strength, and triceps strength were reduced. (*Id.*). Otherwise, Claimant had no subacromial bursa tenderness, full shoulder extension, no biceps fasciculations or atrophy, no triceps fasciculations or atrophy, and normal strength and tone in brachioradialis. (*Id.*). Claimant was assessed with "Parsonage-Turner syndrome" in stable condition, "osteoarthritis generalized multiple" in stable condition, "amyotrophy, neuralgic," and "shoulder pain" which was observed as worsening. (Tr. at 255-56). Claimant received a Kenalog injection into his shoulder, as well as preventive counseling on the benefits of diet and weight control, regular sustained exercise for at least 30 minutes, 3-4 times per week, and regular health screening and checks. (Tr. at 256). Claimant was instructed to return in four to five months. (*Id.*).

On July 1, 2010, Claimant attended a follow-up appointment with complaints of "having more difficulty with weakness and severe pain in the bilateral shoulders" as well as "[h]aving difficulty with even doing activities of daily living." (Tr. at 258). Claimant

described his ability to reach and grasp overhead as significantly impaired and complained of severe pain in the bilateral shoulders. (*Id.*). He reported that steroid injections were "becoming less efficacious and now he cannot perform his work." (*Id.*). Dr. Smith documented Claimant's history of Parsonage-Turner syndrome, as well as prior findings of "rotator cuff tendonitis and advanced OA of the bilateral shoulders." (*Id.*). Claimant's physical examination was normal except for his bilateral upper extremities. (Tr. at 260). Dr. Smith noted shoulder malalignment, biceps tendon tenderness, subacromial bursa tenderness, and subdeltoid bursa tenderness. (*Id.*). Claimant also exhibited reduced shoulder abduction, adduction, extension, flexion, external rotation, and internal rotation. (*Id.*). Claimant was assessed with Parsonage-Turner syndrome, thought to be worsening, "osteoarthritis generalized multiple," worsening, and shoulder pain, also worsening. (Tr. at 260). Dr. Smith concluded that Claimant "needs to be off work indefinitely as pain and weakness severity is worsening." (Tr. at 261). Dr. Smith also "recommended that he may want to consider disability secondarily," however Claimant wanted "to see how leave off work will do and see if symptoms improve." (*Id.*). Accordingly, Dr. Smith instructed Claimant to stop working for three months, and to follow up in 2 months. (*Id.*).

On July 22, 2010, Claimant attended a follow-up appointment with Dr. Smith. (Tr. at 262-65). Claimant's physical examination revealed shoulder malalignment, as well as tenderness in his biceps tendon, subacromial bursa, and subdeltoid bursa. (Tr. at 264). Claimant exhibited reduced shoulder range of motion with respect to abduction, adduction, extension, flexion, external rotation, and internal rotation. (*Id.*). Claimant was assessed with Parsonage-Turner Syndrome, which was assessed as worsening, and for which Dr. Smith instructed Claimant to "continue to remain off work as scheduled."

12

(*Id.*). Claimant was also assessed with "osteoarthritis generalized multiple" and shoulder pain, both of which were observed as worsening. (Tr. at 264-65). Claimant received a Kenalog injection into his shoulder, and was instructed to return in one month. (Tr. at 265).

Claimant continued to attend approximately monthly follow-up appointments with Dr. Smith from August 2010 through June 2011, with complaints of shoulder pain. (Tr. at 266-85, 327-34, 335-38, 370-74).

On August 26, 2010, Claimant's physical condition was essentially the same as it had been the month prior, except that Dr. Smith also observed deltoid atrophy and reduced deltoid strength. (Tr. at 268).  Claimant was assessed with Parsonage-Turner Syndrome, considered to be unchanged, worsening "osteoarthritis generalized multiple," and shoulder pain which was observed as "Unchanged. Improved." (Tr. at 269). Claimant was instructed to "remain off work for the next four months with return pending on evaluation in January 2011" and to follow up in one month. (*Id.*).

On September 21, 2010, Claimant reported that he was "not having any new problems," while his physical examination was documented as unchanged from the month prior. (Tr. at 270-72). However, Claimant was assessed with worsening Parsonage-Turner Syndrome and worsening with "osteoarthritis generalized multiple" and prescribed Flexeril. (Tr. at 272-73). Dr. Smith again instructed Claimant to "remain off work until January 2011" and to follow up in one month. (*Id.*).

On November 11, 2010, Claimant was again assessed with Parsonage-Turner syndrome, status unchanged, and "osteoarthritis generalized multiple," status unchanged. (Tr. at 276-77). Claimant was instructed to follow up in three months. (Tr. at 277). Additionally, Dr. Smith opined that "after extensive review of the patient and

discussion of the persistent symptoms of progressive weakness and pain in the shoulders [he] feel[s] that the patient has no other option but to consider long term disability at this point." (*Id.*).

On December 20, 2010, Claimant was assessed with worsening Parsonage-Turner syndrome, and received a Kenalog injection into his shoulder. (Tr. at 281). By January 20, 2011, Claimant's Parsonage-Turner syndrome was stable, although his shoulder pain was observed as worsening. (Tr. at 284-85). On February 23, 2011 and March 23, 2011, Claimant's physical examinations were noted to be unchanged. (Tr. at 329, 333).

On May 2, 2011, Claimant reported no new problems and his physical examination was reported as unchanged. (Tr. at 335-37). Claimant was assessed with Parsonage-Turner syndrome and shoulder pain, both of which remained the same, as well as "osteoarthritis generalized multiple" which was observed as stable. (Tr. at 337). Claimant was instructed to return in three months. (Tr. at 338).

On June 2, 2011, Claimant again had no new problems and his examination was the same, except that his biceps, triceps, and brachioradialis strength were all reduced. (Tr. at 370-72). Claimant was assessed with Parsonage-Turner syndrome and shoulder pain, stable, as well as stable "osteoarthritis generalized multiple." (Tr. at 373). Claimant was instructed to return in three months. (*Id.*).

Between August 2011 and March 2012, Claimant attended three follow up appointments on an approximately quarterly basis. (Tr. at 351-65). On all three visits, his physical examinations were essentially unchanged. (Tr. at 363-64). He was assessed with Parsonage-Turner syndrome, "osteoarthritis generalized multiple," and shoulder pain, all of which were considered to be as stable. (Tr. at 359). Claimant was prescribed

14

Lortab for his discomfort. (*Id.*).

### B. Physical Evaluations and Opinions

On March 16, 2011, Andres L. Rago, M.D., conducted an examination of Claimant at the request of the West Virginia Disability Determination Service, consisting of an interview, a complete physical examination, review of medical records, and a written assessment. (Tr. at 304-07). Claimant reported a history of Parsonage-Turner syndrome and osteoarthritis of the shoulders, which worsened in 2002 without any history of injury. (Tr. at 304). Claimant described experiencing "weakness of both upper extremities associated with persistent aching pain with the muscle tissue and burning sensation inside the shoulder joints," as well as the "slow onset of atrophy of the muscles of both shoulders (deltoid muscles) and the rest of the muscle of the arm" which eventually included his forearms. (*Id.*). Claimant reported ongoing weakness of the upper extremities, severe limitation of motion of the shoulder joints, difficulty raising above his head, inability to use hands while arms were raised to shoulder level, moderate-to-severe pain which is slightly and temporarily relieved with opiates, and difficulty sleeping due to pain. (Tr. at 305). Claimant stated that he was "told that nothing could be done with the shoulders surgically." (*Id.*).

Claimant's physical examination was largely normal, except that his upper extremities exhibited "slight tenderness of both shoulders with remarkable limitation of motion of both shoulder joints." (Tr. at 307). Claimant was "able to write, button, and pick up coins with either hand with slight difficulty," and Dr. Rago observed that "[d]espite of the abnormalities in the muscles of the arms and forearms, the patient is able to do fine manipulation to some extent" with his hand grip being "fairly adequate." (*Id.*). Dr. Rago also noted that Claimant's 2008 left-shoulder x-ray revealed

"degenerative changes of the left shoulder with hypertrophic inflammatory changes of the acromiaclavicular joint." (*Id.*). Claimant exhibited reduced range of motion in his shoulder flexion (100° bilaterally, standard 180°), abduction (90° bilaterally, 180° standard), adduction (40° bilaterally, 50° standard), internal rotation (30° bilaterally), 40° standard), and external rotation (80° bilaterally, 90° standard). (Tr. at 309). His upper extremity strength was rated 4/5 in both arms. (*Id.*). Otherwise, Claimant exhibited a full range of motion in his elbows, wrists, knees, hips, cervical spine, and lumbar spine. (Tr. at 309-10). In regard to the lower half of his upper extremities, in particular, his elbows had full flexion, extension, supination and pronation bilaterally, and both wrists had full dorsiflexion, palmar flexion, radial deviation, and ulnar deviation. Claimant's hands could be fully extended; he could make fists; and his fingers could be opposed. His grip strength was measured as 5/5 in both the right and left hands, and his fine manipulation was noted to be normal. (Tr. at 309).

Accordingly, Dr. Rago assessed Claimant with Parsonage-Turner syndrome, which he described as "a rare disease entity affecting the nerve supply of the shoulders and that of the arms and forearms resulting to a gradual muscular atrophy and weakness of the upper extremities." (Tr. at 307). Dr. Rago observed that Claimant's "use of the upper extremities is limited because he cannot raise the arms above the head and complains of constant pain, sometimes severe, at the shoulder joints." (*Id.*). Claimant was also assessed with hypothyroidism, which was "being treated accordingly." (*Id.*). Dr. Rago opined that Claimant's prognosis was "guarded to poor." (*Id.*).

On March 25, 2011, Rabah Boukhemis, M.D. completed a physical RFC opinion of Claimant based upon Dr. Rago's examination and relevant medical records review. (Tr. at 311-18). Dr. Boukhemis opined that Claimant could occasionally lift and/or carry

16

20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk with normal breaks for a total of about 6 hours in an 8 hour workday, sit for a total of about 6 hours in an 8-hour workday, and had unlimited ability to push and/or pull. (Tr. at 312). Dr. Boukhemis opined that Claimant could frequently climb ramps and stairs, balance, stoop, and kneel; could occasionally crouch; and could never climb ladders, ropes or scaffolds, or crawl. (Tr. at 313). Dr. Boukhemis assigned "frequent limitations" to reaching all directions (including overhead), but opined that Claimant had unlimited handling, fingering, and feeling. (Tr. at 314). Regarding environmental limitations, Dr. Boukhemis opined that Claimant should avoid even moderate exposure to hazards such as machinery and heights; avoid concentrated exposure to extreme cold, wetness, humidity, and vibration; and could withstand unlimited exposure to extreme heat, noise, and irritants such as fumes, odors, dusts, gases, and poor ventilation. (Tr. at 315). Dr. Boukhemis observed that "it looks as if Claimant had Parsonage Turner syndrome that seems to have recovered some," based upon Dr. Rago's examination which revealed "mostly fair strength and fair neuro exam." (Tr. at 318). Dr. Boukhemis noted that there was "[s]till osteoarthritis shoulders bilaterally with DJD/RC degenerative," but considered Claimant's allegations to be only "partially credible," and found his impairment to be "not at Listing level severity." (*Id.*)

On May 26, 2011, A. Rafael Gomez, M.D., provided a case analysis, in which he affirmed as written Dr. Boukhemis' physical RFC opinion. (Tr. at 342).

### C. New Evidence In Support of Remand

On October 30, 2012, occupational therapist Trish Clark, MOTR/L, provided a functional capacity evaluation report of Claimant, consisting of an interview, pain assessment testing, range of motion evaluation, physical examination, and RFC opinion.

(ECF No. 18-1). Ms. Clark opined that Claimant was limited to sedentary work ("exert up to 10 lbs. occasional, sit most of the time, occasional walk and stand"), and that Claimant could lift a maximum of "10 lbs. from floor to waist height; 15 lbs. from 12-inch from floor to waist height; and 10 lbs. from waist to shoulder height," but that Claimant "was unable to perform overhead lifting due to restricted active range of motion below shoulder height." (*Id.* at 1). Regarding postural limitations, Ms. Clark opined that Claimant could frequently sit, stand, twist, and grasp with both left and right hands; could occasionally walk, climb, squat, kneel, forward bend, right forward reach, and left forward reach; and could never right overhead reach or left overhead reach. (*Id.*).

Claimant's pain assessment scores reflected that his "perceived physical capabilities correlate with present physical performance" and that his "scores suggest an appropriate pain focus." (*Id.* at 2). Claimant exhibited diminished range of motion in his bilateral shoulder flexion (80° right, 70° left, 150° standard), abduction (74° right, 60° left, 180°standard), internal rotation (72° right, 74° left, 90° standard), and external rotation (48° right, 52° left, 90° standard). (*Id.* at 3). Claimant's strength "was also decreased in all planes of motion in the upper extremity" and Claimant "reported pain during all upper extremity range of motion and with right ankle inversion/eversion." (*Id.*). Additionally, Ms. Clark noted "atrophy of bilateral supraspinatus, infraspinatus, deltoids, and triceps," as well as "bilateral scapular protraction" and "decreased lumbar lordosis." (ECF No. 18-1 at 3). Claimant's "distraction testing did correlate with clinical findings, suggesting full effort." (*Id.*). On physical examination, Claimant "maintained a slouched posture in both sitting and standing" and exhibited "bilateral scapular protraction, internal rotation, and glenohumeral anterior subluxation" as well as "winging of the right scapula." (*Id.* at 4). Claimant's grip strength testing reflected full

effort, while his fine motor testing fell below the 50th percentile with Claimant needing to stabilize his elbows on the table during testing. (ECF No. 18 at 6-7). Claimant was able to perform a half squat, a forward bend with 30-60° of motion, and climb with his legs only. (*Id.* at 7). Ms. Clark observed that Claimant could not perform overhead reaching "due to decreased active range of motion" and that he "terminated forward reaching due to reported increased upper extremity pain." (*Id.*). Furthermore, when attempting forward reaching, Claimant "exhibited shoulder hiking and stabilization of the elbows against the trunk." (*Id.*).

## VI.   <u>**Standard of Review**</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a de novo review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If

substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

### A. RFC Assessment

Claimant contends that the ALJ's RFC assessment is unsupported by substantial evidence on record as a result of the ALJ's "selective acknowledgment of pertinent record entries" from treating and examining physicians, and his deficient analysis of Claimant's credibility. (ECF No. 16 at 11-18).

### 1.   Medical Source Opinions

Claimant's assertion that the ALJ engaged in "selective acknowledgment of pertinent record entries," is just a fancy way of saying that the ALJ improperly weighed the medical evidence. (ECF No. 16 at 18). First, Claimant faults the ALJ's interpretation of the medical findings and opinions of Claimant's treating physician, Dr. Smith. (*Id.* at 16-17). Second, Claimant argues that the ALJ mischaracterized the report provided by the consultative examiner, Dr. Rago. (*Id.* at 17-18). Neither argument is persuasive.

Medical source opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite [her] impairment(s), and [her] physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [she] receives." *Id.* § 404.1527(b).

When weighing medical source opinions, an ALJ should generally give more

weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See id.* § 404.1527(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given controlling weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the claimant's case record. *Id.*; *see also* SSR 96-2p, 1996 WL 374188, at *2 (S.S.A. 1996) (explaining that "'medical opinions' are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight."). When a treating physician's medical opinion is not afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6)[3] and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188 *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Medical source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." SSR 96-5p, 1996 WL 374183, at *2. However, these opinions must still always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole.  *Id.* at *2-3. As explained in SSR 96-5p,

> The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

*Id.* at *3. Although the ALJ is required to *consider* all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to *discuss* all evidence in the record." *Aytch v. Astrue*, 686 F.Supp. 2d 590, 602 (E.D.N.C. 2010) (emphasis added); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Indeed, "[t]o require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, Case No. 2:08-cv—20-FL, 2009 WL 2135081, at *4

(E.D.N.C. July 15, 2009).

Here, Claimant takes issue with the ALJ's conclusion that Claimant's impairments were "present at approximately the same level of severity" both before and after the alleged disability onset date. (ECF No. 16 at 16; Tr. at 33). According to Claimant, the ALJ must have disregarded Dr. Smith's records, or simply refused to recognize the significant worsening of Claimant's condition documented by Dr. Smith in mid-2010, which prompted him to recommend that Claimant seek long-term disability. In this argument, Claimant refers to a statement made by the ALJ in the course of assessing Claimant's credibility. Specifically, the ALJ indicated that Claimant had complained of and been treated for essentially the same shoulders impairments for an extended period of time prior to his disability onset date and had continued to work during that period "despite the fact his impairments were present at approximately the same level of severity as they are presently." (Tr. at 33). Because of Claimant's history of working with significant shoulder impairments, the ALJ questioned the credibility of Claimant's statements regarding the persistence, severity, and disabling effects of his current impairments.

Having considered the record as a whole, the undersigned disagrees that the ALJ's statement reflects a misunderstanding or rejection of Dr. Smith's medical findings and opinions. Instead, the ALJ was merely trying to convey that the objective medical findings used to describe Claimant's shoulder impairments were similar both before and after the disability onset date, making it difficult to understand how Claimant was capable of working with shoulder-related symptoms in the past, but was unable to do so at present.

The record reflects that Claimant's complaints of bilateral shoulder pain began in April 2003. He described pain that increased with activities, especially overhead motions. (Tr. at 227-31). Claimant reported having severe pain at the outset, but with treatment, the pain had decreased to a two on a ten-point scale. By June 2003, however, Claimant had atrophy and weakness in both shoulders and rated his pain as a four out of ten. (Tr. at 344). Although he had a full range of motion in his shoulders, he was assessed with a possible neurological impingement, which was subsequently identified as a "bilateral brachial plexopathy, or Parsonage-Turner syndrome." (Tr. at 381). By this time, in September 2003, Claimant's medical findings included decreased strength in his triceps and biceps, atrophy of his girdle muscles bilaterally, with winging of the right scapula, and "weakness in infraspinatus, supraspinatus, deltoids, and right serratus anterior" muscles. (*Id.*). Claimant required physical therapy to increase his range of motion and strengthen his shoulder muscles. Despite these significant shoulder impairments, Claimant continued to work.

The records pick up next in January 2008. Claimant again complained of significant left shoulder pain, especially with overhead activities. (Tr. at 346). He was diagnosed with left shoulder osteoarthritis and impingement syndrome. An MRI showed AC joint anthropathy partial thickness cuff tear and biceps tendon fraying, as well as impingement syndrome. Claimant received shoulder injections for his pain. Again, during this period of time, Claimant was working.

On April 20, 2009, Claimant saw Dr. Smith and described symptoms of continuous pain localized to the AC joints of both shoulders, the severity of which he rated at 7 or 8 on a scale of 10. (Tr. at 241). He reported that the pain began approximately four to six years earlier, and the onset was gradual, although the pain had

been worsening over the past few months. Claimant experienced pain with activity and range of motion, had popping, felt stiffness with activities and twisting, and was tender. (*Id.*). Claimant's physical examination revealed tender biceps tendon and subdeltoid bursa, reduced shoulder abduction, adduction, and flexion, and shoulder instability. (Tr. at 243). Claimant's deltoid strength, biceps strength, and triceps strength were reduced. (*Id.*). Claimant was assessed with osteoarthritis, Parsonage-Turner syndrome, and neuralgic amyotrophy. (Tr. at 243-44). He received injections in both shoulders. Yet, at this time, Claimant was reportedly working.

Dr. Smith's treatment records between April 2009 and March 2012 show few changes in Claimant's physical examination findings. (Tr. at 241-85, 328-37, 351-60, 370-74). Certainly, Claimant's subjective complaints varied from time-to-time, and Dr. Smith's records reflect periods of waxing and waning, periods of stability interrupted by periods of deterioration. Nevertheless, the underlying findings pertinent to Claimant's shoulder impairments were not markedly different during the years before and after the disability onset date.[4] The ALJ apparently intended to highlight this aspect of the evidence when he made the comparison that Claimant finds objectionable. However, the ALJ's statement does not show that he improperly weighed Dr. Smith's findings, or disregarded his records. To the contrary, the written opinion contains a detailed account of Claimant's treatment records, demonstrating that the ALJ thoroughly reviewed the relevant medical evidence. (Tr. at 32).

---

[4] Claimant correctly points out that although atrophy was not present prior to his alleged onset date of July 2, 2010, (Tr. at 255), it was later observed by Dr. Smith subsequent to his alleged onset date. (Tr. at 268, 272, 276, 280, 284). However, this appears to be the only degenerative change observed by Dr. Smith throughout his treatment of Claimant between April 2009 and March 2012. While the ALJ did incorrectly state that "there was no atrophy" in his summary of Dr. Smith's treatment records, (Tr. at 32), the ALJ specifically noted Dr. Rago's finding of atrophy in Claimant's deltoid muscle and acknowledged Claimant's "muscular atrophy and weakness" in the upper extremities in the course of "giv[ing] all benefit of doubt to the claimant allegations" in assessing his RFC. (Tr. at 33-34). Thus, to the extent Claimant argues that the ALJ erred in his recitation of Dr. Smith's observations, this error was harmless.

Claimant also faults the ALJ for stating that consultative examiner, Dr. Rago, found that Claimant was "able to do fine manipulations" and that Claimant's hand grip was "adequate," whereas Dr. Rago's report indicates that Claimant was "able to do fine manipulation *to some extent*" and that Claimant's handgrip was "*fairly* adequate." (Tr. at 307) (emphasis added). This parsing of words is insufficient to render the ALJ's RFC determination unsupported by substantial evidence. Dr. Rago's findings as to Claimant's hands were based upon his observations that Claimant was "able to write, button, and pick up coins with either hand," a fact which the ALJ noted in his review of Dr. Rago's examination. (Tr. at 32). Moreover, Dr. Rago's findings are consistent with Dr. Smith's observations of Claimant's impairments as they existed both shortly before and after the alleged onset date. (Tr. at 304-08). As with Dr. Smith's physical examinations, Dr. Rago noted tenderness and remarkable limitation of motion in both of Claimant's shoulders, but no objective findings of impairment in Claimant's elbows, wrists, or hands. (Tr. at 307, 309-10).

On the last office visit of record, March 12, 2012, Dr. Smith documented that Claimant had "reduced" shoulder extension, flexion, rotation, adduction, and abduction. (Tr. at 353). In addition, Claimant's shoulder muscles were weak and his deltoid muscles showed atrophy. However, Claimant had normal shoulder stability. He also had a full range of motion in his elbows, as well as normal stability, strength, tone and a full range of motion in his lower arms. (*Id.*). Simply put, Claimant's shoulders were weak and did not move well, but the remainder of his upper extremities was normal. A year earlier, Dr. Rago made essentially the same findings. (Tr. at 390). On March 16, 2011, Dr. Rago documented that Claimant's elbows had full flexion, extension, supination and pronation bilaterally, and both wrists had full dorsiflexion, palmar flexion, radial

deviation, and ulnar deviation. Claimant's hands could be fully extended; he could make fists; and his fingers could be opposed. His grip strength was measured as 5/5 in both the right and left hands, and his fine manipulation was noted to be normal. (Tr. at 309).

Although Claimant insists that "the ALJ did not fairly examine the evidence in constructing the residual functional capacity," (ECF No. 16 at 18), he fails to identify any additional functional limitations which the ALJ failed to consider or apply to Claimant. Two agency experts, who reviewed and relied upon Dr. Rago's examination record, opined that Claimant's impaired shoulders affected his ability to perform basic work activities on a function-by-function basis by reducing his capacity to lift; carry; reach; climb ladders, ropes, and scaffolds; crouch; crawl; and by limiting his exposure to hazards, heights, vibrations, extreme cold, wetness and humidity. (Tr. at 312-15, 342). The ALJ adopted all of these limitations. Accordingly, rather than "selectively" reviewing the record, the ALJ gave considerable weight to all of the medical source opinions when determining the nature, extent, and functional impact of Claimant's physical impairments. Dr. Smith's records were consistent with Dr. Rago's examination report. The agency experts based their opinions on Dr. Rago's report, and they opined that Claimant was capable of performing light work, subject to the limitations that the ALJ ultimately adopted as part of Claimant's RFC. (Tr. at 342).

Accordingly, the undersigned **FINDS** that the ALJ properly weighed the medical findings and statements, and the RFC is supported by substantial evidence.

### 2.   Claimant Credibility Analysis

Claimant also argues that the ALJ's rationales for discounting his credibility were improper. (ECF No. 16 at 18). Pursuant to the Regulations, the ALJ evaluates a claimant's report of symptoms using a two-step method. 20 C.F.R. § 404.1529. First, the

ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 404.1529(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location,

duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7p, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations. . . for the purposes of judging the credibility of the individual's

statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ provided an overview of Claimant's testimony, (Tr. at 31-32), which he then compared to the relevant medical evidence and consultative evaluations in order to assess Claimant's credibility. (Tr. at 32-34). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms he alleged, but that Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were only partially credible. (Tr. at 33). The ALJ completed a longitudinal review of the record, finding that Claimant's "treatment has been essentially routine

and/or conservative in nature," that prescribed "medications have been relatively effective in controlling his symptoms," and that there have not been any "restrictions recommended by the treating doctor." (Tr. at 32-33). Additionally, the ALJ noted that Claimant's activities of daily living, which included doing some yard work on a riding lawn mower, washing his SUV, going deer hunting with a crossbow and rifle, exercising with light hand weights, driving, and watching after his grandson were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. at 33). The ALJ gave significant weight to the State agency consultative evaluators' RFC opinions, ultimately adopting them as consistent with "some of the claimant's own subjective allegations, the relatively benign objective findings both prior to and after the alleged onset date, the conservative degree of treatment the claimant has received, and the record as a whole which does not exhibit the types of medical treatment one would expect for a totally disabled individual." (Tr. at 34).

Claimant objects to several of the ALJ's rationales for discounting the credibility of his statements regarding his impairments. In particular, Claimant objects to the ALJ's characterization of his treatment as "essentially routine and/or conservative in nature," and the observation that his prescribed pain medication had been "relatively effective in controlling his symptoms." (ECF No. 16 at 12). Claimant argues that there is "no recitation to any portion of the record supporting such conclusions" and "no basis for concluding that there was an effective treatment for [his] conditions, other than the treatment he is receiving." (*Id.*). Claimant likewise argues that the ALJ's "expectation that treatment record would contain restrictions placed on [Claimant] by treating physicians" is "in no way, shape, or form a legitimate factor arguing against [his] credibility." (*Id.* at 13).

The undersigned finds that the ALJ's observation that the record included "no restrictions recommended by the treating doctor" is contradicted by repeated medical work releases issued by Dr. Smith. (Tr. at 261, 264, 269, 273, 277). Although Dr. Smith did not list specific functional limitations that Claimant was precluded from doing, it is clear that he considered Claimant incapable of performing a significant portion of the functional requirements of his job as a truck mechanic. Similarly, the ALJ's conclusion that the Claimant's pain medications "have been relatively effective in controlling his symptoms" finds little support on the record. (Tr. at 33). Although Claimant testified at the hearing that he takes Lortab for his shoulder pain, (Tr. at 47, 49), there is no indication from the medical evidence that the pain medication has ameliorated any of the other symptoms of Parsonage-Turner syndrome, including his loss of strength and inability to reach above his shoulders. (Tr. at 47). Claimant testified that his treating physicians have informed him that there is no cure for Parsonage-Turner syndrome, (Tr. at 46), and "have basically told [him] that there's nothing they can do for [him]." (Tr. at 55). This testimony was consistent with Claimant's prior statements to examining physician Dr. Rago, "that nothing can be done with the shoulders surgically," (Tr. at 305), as well as Dr. Smith's own recommendation that Claimant seek disability benefits due to "persistent symptoms of progressive weakness and pain in the shoulders." (Tr. at 277). Although medical source opinions regarding whether a Claimant is disabled are not entitled to any special weight, *see* 20 C.F.R. § 404.1527(d), Dr. Smith's opinion does tend to reflect waning optimism regarding the likelihood of improvement of Claimant's impairments, despite ongoing treatment.

Notwithstanding the above rationales for discounting Claimant's credibility, the undersigned finds that the ALJ's RFC opinion is supported by substantial evidence on

32

the record. As the ALJ correctly noted, Claimant's allegations of disabling limitations are inconsistent with his own statements regarding activities of daily living. During the administrative hearing, Claimant testified that he drives short distances, (Tr. at 47); "tries to do a little yard work" including "rid[ing] the mower for a while," although his stepson does most of it for him because he "can't do anything heavy," (Tr. at 50-51); washes his Ford Escape, (Tr. at 51), watches his 11 year old grandson while he swims in the pool and plays video games, (Tr. at 52); and goes deer hunting with both a crossbow and a rifle. (Tr. at 52-54). He also has a regular exercise program which involves the use of three-pound hand weights. (Tr. at 56-57). Claimant argues that the ALJ's "reliance on these activities represents a gross misrepresentation of the quality of these activities and the evidence as to their extent." (ECF No. 16 at 14). However, the ALJ's RFC determination represents the most that a claimant can do, rather than the least. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. 1996). Although Claimant's description of his activities of daily living does not strictly match the maximum exertional and postural capacities reflected in ALJ's RFC determination, it is evident from his testimony that he has been able to maintain a relatively active lifestyle that is inconsistent with his claim of disabling impairment. Moreover, Claimant fails to identify any particular statements or testimony which, if credited, would have resulted in a more limited RFC determination. Although Claimant's counsel posed two hypothetical questions involving work breaks "for numbness and tingling to sit down and then regain strength and come back to work," (Tr. at 62), there is little to no support on the record including Claimant's own testimony supporting the existence of such symptoms. As discussed above, the ALJ's RFC opinion is consistent with the objective medical evidence on record. *See supra* Part VII.A.1.

In short, it is clear that the ALJ conducted a thorough analysis of the relevant evidence, appropriately weighed the medical source opinions, and provided a logical reason for discounting the credibility of Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms, in accordance with the applicable Regulations. It is equally clear that the ALJ fully accounted for Claimant's impairments in the RFC finding.

Accordingly, the undersigned **FINDS** that the ALJ performed an appropriate credibility analysis, in accordance with governing regulations. Consequently, the undersigned further **FINDS** that Claimant's arguments are without merit, and the ALJ's RFC finding is supported by substantial evidence.

### B. Motion to Remand Based on New Evidence Provided to the Court

Claimant seeks to have his case remanded for further review by the Commissioner in light of Ms. Clark's October 2012 Functional Capacity Evaluation Report, which Claimant submitted with his Motion to Remand. (ECF No. 18). Claimant contends that this report "was performed within several months following the decision and is germane to issues presented by [his] application." (*Id.* at 1).

The Court may remand the Commissioner's decision for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand is appropriate when the Commissioner's decision is not supported by substantial evidence, the Commissioner incorrectly applies the law when reaching the decision, or the basis of the Commissioner's decision is indiscernible. *Brown v. Astrue,* Case No. 8:11–03151–RBH–JDA, 2013 WL 625599 (D.S.C. Jan. 31, 2013) (citations omitted). If new and material evidence is submitted after the ALJ's decision, the Appeals Council:

shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R § 404.970(b). When the Appeals Council incorporates new and material evidence into the administrative record, and nevertheless denies review of the ALJ's findings and conclusions, the issue before the Court is whether the Commissioner's decision is supported by substantial evidence in light of "the record as a whole including any new evidence that the Appeals Council specifically incorporated into the administrative record." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (remanding for rehearing pursuant to sentence four of 42 U.S.C. § 405(g)) (quoting *Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (internal marks omitted)). If the ALJ's decision is flawed for any of the reasons stated, the Court may remand the matter for a rehearing under sentence four.[5]

In contrast, sentence six applies to a remand based upon new and material evidence supplied to the Court, which was not submitted to the ALJ or the Appeals Council and was not considered in reaching the Commissioner's final disability decision. *Cameron v. Astrue*, No. 7:10CV00058, 2011 WL 2945817, at *7 (W.D. Va. July 21, 2011) ("Sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council."). The sixth sentence of 42 U.S.C. § 405(g) provides that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence

---

[5] Sentence four allows the court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . ." 42 U.S.C. § 405(g). Remand to the Commissioner on the basis of newly discovered evidence is appropriate if four prerequisites are met:

> (1) the evidence must be relevant to the determination of disability at the time the application(s) was first filed [and not simply cumulative]; (2) the evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant must make at least a general showing of the nature of the new evidence to the reviewing court.

*Miller v. Barnhart*, 64 F.App'x 858, 859-06 (4th Cir. 2003); *see also* 42 U.S.C. § 405(g); *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985).

Here, the new evidence was not submitted to the Appeals Council or incorporated into the record. (Tr. at 4). Accordingly, Claimant must satisfy the requisite criteria for remand under sentence six of 42 U.S.C. § 405(g). Certainly, Claimant has made a general showing of the nature of the new evidence by attaching it to his brief. (ECF No. 18-1). However, he fails to establish the remaining three prerequisites. Given that Claimant has failed to demonstrate that Ms. Clark's evaluation satisfies the requisite criteria, remand is not appropriate in his case. (ECF No. 18).

First, Ms. Clark's physical examination and opinion regarding Claimant's ability to work relates only to his condition at the time of the examination, (*Id.* at 1), which occurred nearly two years after Claimant's initial application for benefits, and over four months after the ALJ's decision. (Tr. at 35, 153). Although the evaluation appears to relate to the same impairments assessed by the ALJ, it does not purport to relate back to the alleged onset date or the period during which Claimant first filed his application.

36

Second, even assuming the additional evaluation was relevant to the applicable time period, it would not reasonably have affected the Commissioner's decision. As the Commissioner points out, Ms. Clark is an occupational therapist. Under the Social Security regulations, therapists are not "acceptable medical sources" and, for that reason, their opinions are not entitled to as much weight as acceptable medical sources, who are considered "the most qualified health care professionals." SSR 06-03p, 2006 WL 2329939, at *5 (S.S.A. 2006). Generally, opinions from individuals that are not "acceptable medical sources" are seldom given more weight than an acceptable medical source and usually only when they have seen the claimant more often than the treating source, have provided better supporting evidence, and have a better explanation for their opinions. (*Id.*).  In this case, Ms. Clark's objective findings of decreased range of motion in Claimant's shoulders, as well as her observations of decreased arm and hand strength, (ECF No. 18-1 at 3), are largely duplicative of Dr. Rago's examination findings. (Tr. at 309-10). Ms. Clark did assign greater postural restrictions to Claimant than the ALJ found, but her opinion in that regard appears to be based entirely upon testing which occurred in the course of a single morning. (ECF No. 18-1 at 2). Ms. Clark did not have the benefit of additional evidence including a longitudinal review of treatment records and x-ray results, which both the consultative physicians and the ALJ reviewed in the course of their analyses. Thus, it is unlikely that the ALJ would have given much weight to Ms. Clark's opinions, as they were clearly not based on all of the evidence, were not supported by a better explanation, were not the result of repeated examinations, and were not provided by an acceptable medical source.

Finally, Claimant has not demonstrated good cause for his failure to submit Ms. Clark's evaluation when his claim was before the Commissioner. Claimant's new

evaluation occurred on October 30, 2012, while his claim was pending review before the Appeals Council. The Appeals Council did not deny review of the ALJ's decision until eight months later, on July 3, 2013. Claimant offers no explanation as to why he failed to submit the evaluation to the Appeals Council, and therefore has not demonstrated good cause for the delay.

Accordingly, remand is not appropriate on the basis of Claimant's new evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 15), **DENY** Plaintiff's Motion to Remand, (ECF No. 18), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 17), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** August 11, 2014

Cheryl A. Eifert
United States Magistrate Judge